***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Holmes and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. Having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Holmes, with minor modifications.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties at and subsequent to the hearing before the Deputy *Page 2 
Commissioner and in a Pre-Trial Agreement, which was admitted into the record and marked as Stipulated Exhibit (2) as:
 STIPULATIONS
1. All parties are properly before the Commission and the Commission has jurisdiction of the parties and subject matter herein.
2. All parties are correctly designated and there is no question as to mis-joinder or non-joinder of parties and all parties are subject to the North Carolina Workers' Compensation Act.
3. The date of plaintiff's alleged injury by accident is 18 February 2008.
4. On 18 February 2008, Mr. James A. Servance was an employee of Wikoff Color Corporation and held the position of production mill operator. An employer-employee relationship existed between Mr. James A. Servance and Wikoff Color Corporation on that date.
5. On the date in question, The Phoenix Insurance Company was the workers' compensation carrier for defendant-employer.
6. On 18 February 2008, the parties were bound by and subject to the provisions of the North Carolina Workers' Compensation Act.
7. The deceased-employee was out-of-work from 18 February 2008 until the date of his death on 28 February 2008.
8. At the hearing, the parties submitted a Notebook of Various Stipulated Exhibits, which was admitted into the record and marked as Stipulated Exhibit (1) and which included the following:
 a. Industrial Commission Forms and Filings;
 b. Plaintiff's Responses to Defendants' Discovery; *Page 3 
 c. Defendants' Responses to Plaintiff's Discovery;
 d. Documents produced in Discovery;
 e. Medical Records;
 f. Medical Bills;
 g. A Death Certificate;
 h. An Autopsy Report;
 i. The Deposition Transcript of Tim Russell;
 j. The Deposition Transcript of Kirk Mathis;
 k. Kirk Mathis' Time Sheet, and;
 l. The Affidavit of Dr. Forbes McMullin.
 *********** ISSUES TO BE DETERMINED
1. Whether James A. Servance (hereinafter "Decedent") sustained a compensable injury by accident on February 18, 2008, while in the course and scope of his employment with Defendant-Employer and if so, whether Decedent's subsequent death was the proximate result thereof?
2. Whether Decedent's widow, Jeanette Servance (hereinafter "Plaintiff"), is entitled to death benefits pursuant to the Act and to have medical expenses associated with Decedent's injury and death paid for by Defendants?
3. What is Decedent's correct average weekly wage and corresponding compensation rate?
4. What amounts, if any, are Defendants entitled to receive pursuant to N.C. Gen. Stat. § 97-10.2 from any third-party recovery Plaintiff obtains? *Page 4 
 ***********
Based upon the foregoing Stipulations and evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. On February 18, 2008, Decedent was forty-one years of age, with his date of birth being February 24, 1966.
2. Also as of that date, Decedent was six feet one inches tall and weighed approximately 295 pounds, with his medical records reflecting that he was considered obese.
3. Prior to his marriage to Plaintiff on March 24, 2000, Decedent smoked cigarettes for a number of years. Decedent's medical records reflect a history of hypertension, with questionable management of that condition. Defendant-Employer's other employees testified that Decedent did not appear to be someone who exercised regularly.
4. Decedent began working for Defendant-Employer on May 22, 2006. On February 18, 2008, he was employed as a mill operator for Defendant-Employer, which manufactures and packages printing ink. In that capacity, Decedent's duties included operating a machine that packaged ink either in five-pound cans, or in two or three gallon buckets. Decedent was permitted to stand or sit as needed, but it was estimated that he sat approximately six out of every eight hours.
5. On February 18, 2008, Decedent was working at Defendant-Employer's facility on Interstate Street in Charlotte. The facility consisted of a single large brick building with offices located in the front of the building, and with the remainder of the space used for production. There was a parking lot on the side of the building used primarily by office personnel. Production workers used a parking lot located in the rear of the building. There was *Page 5 
no fence surrounding the premises, and it was not necessary to enter or exit the property through a security gate or station.
6. Hourly employees such as Decedent used a time clock to record their arrival and departure from work. Decedent and other hourly employees were given a one-hour lunch break during which they were supposed to clock out upon departing and clock back in upon their return. However, the credible evidence of record establishes that it was common for employees to forget to clock out when leaving for lunch. Regardless of whether or not an hourly employee clocked out for lunch, they were not paid for their lunch break.
7. During their unpaid lunch breaks, hourly employees were permitted to leave Defendant-Employer's premises, and they did not have to obtain permission before doing so. Although Tim Russell, Defendant-Employer's production manager, had the authority to require an employee to work through their regularly scheduled lunch hour, he had never done so.
8. There were no restrictions imposed by Defendant-Employer on where employees went during their lunch breaks. The only requirement was that employees report for duty when their lunch breaks were over and it was time to resume work.
9. Several years prior to February 18, 2008, Daniel Mackey, a production employee, erected a basketball goal at one end of the parking lot behind Defendant-Employer's building. There was no area marked off on the surface of the parking lot as a basketball court. Defendant-Employer did not purchase, install, or maintain the basketball goal. Additionally, Defendant-Employer never encouraged employees to use the basketball goal, arranged games for employees, or sponsored in any manner use of the basketball goal.
10. Mr. Russell testified that, as with lunch breaks in general, he had the authority to order employees who were playing basketball in the parking lot to return to work, or to prohibit *Page 6 
them from playing if the workload required otherwise.
11. In February 2008, the basketball goal was used primarily by employees Kirk Mathis and Kilmick Williams. The credible evidence of record establishes that Mr. Mathis and Mr. Williams used the basketball goal approximately four times per month and that employees did not use the goal during hours they were supposed to be clocked in. Mr. Mathis testified that he primarily used the goal to get fresh air. Mr. Mathis further testified that when he and Mr. Williams used the goal, they merely stood around, shot the ball and talked, and did not actually play games.
12. During February 2008, Defendant-Employer had 10 to 15 production employees. The overwhelming majority of Defendant-Employer's employees never used the basketball goal.
13. Mr. Mathis did not consider shooting basketball to be an exercise in building teamwork. Additionally, the credible evidence of record establishes that Defendant-Employer did not encourage employees to use the goal for the purpose of fostering team work.
14. On February 18, 2008, Mr. Mathis clocked out for lunch at 12:09 p.m. Mr. Williams also clocked out for lunch on that date.
15. On February 18, 2008, Mr. Mathis and Mr. Williams decided to shoot basketball during their lunch hour. At some point after they started shooting, Mr. Russell joined them. While Mr. Mathis, Mr. Williams and Mr. Russell were shooting basketball, they observed Decedent drive onto Defendant-Employer's premises upon return from his lunch break and park in the area behind Defendant-Employer's building. When Decedent got out of his car, he walked over to the basketball goal where Mr. Mathis, Mr. Williams and Mr. Russell were shooting baskets. At that time, Mr. Williams asked Decedent if he wanted to play, and the four men then began to play a game of two-on-two basketball. *Page 7 
16. Mr. Russell and Decedent were on different teams. After playing for approximately five to ten minutes, Decedent's feet and Mr. Russell's feet became entangled, causing Decedent to fall on his knees.
17. In a recorded statement taken on February 28, 2008, Decedent indicated that when his injury occurred, "[w]e were clocked out for lunch break." Decedent's time card showing his time worked on February 14, 15 and 18, 2008 is inconclusive as to whether he was clocked in or clocked out at the time of his injury on February 18, 2008. The printed information on the timecard reflects that he clocked in at 8:32 a.m., clocked out at 1:15 p.m., then clocked in again at 2:04 p.m. on that date. However, a handwritten note on the time card reflects that Plaintiff took a lunch break from 12:00 p.m. to 1:00 p.m. on Monday. In 2008, February 18 fell on a Monday. There is no indication that Decedent clocked out a second time on February 18, 2008.
18. Following the incident on February 18, 2008, Decedent reported that his knees were hurting, and he was provided a chair to sit in. Thereafter, it was determined that Decedent should be examined at a hospital. Mr. Russell and the other non-injured employees were unable to get Decedent into one of their vehicles, so an ambulance was called. According to Mecklenburg County EMS records, a crew arrived at the scene at 1:52 p.m.
19. On February 19, 2008, Mr. Russell completed a report reflecting that the incident at issue occurred at 12:30 p.m. However, Mr. Mathis testified that the incident could have occurred somewhat later than 12:30 p.m. Regardless, all of the involved parties, including Decedent, agreed that the incident occurred during lunch break when they were not being paid.
20. From the scene, Decedent was transported to Carolinas Medical Center-University, where he was admitted at 2:20 p.m. At that facility, Decedent was diagnosed as having sustained internal derangements of both his right and left knee. Decedent was discharged *Page 8 
with medications and instructions to immobilize his knees and to use the crutches he was provided.
21. On February 22, 2008, Decedent was examined at OrthoCarolina by Mr. John Harrison, a physician's assistant. Decedent was unable to stand on that date and x-rays revealed possible ruptures of the patella tendon in both knees.
22. On February 25, 2008, Decedent underwent a procedure to repair the patella tendons in both knees. Splints were applied to both of Decedent's legs and he was discharged home.
23. Plaintiff testified that on the morning of February 28, 2008, she was talking to Decedent when his eyes rolled back in his head, and he passed out. Plaintiff further testified that Decedent regained consciousness, but again passed out. Thereafter, Plaintiff called 911 and Mecklenburg County EMS responded at 10:43 a.m. Decedent reported problems breathing and while he was being assisted with a wheelchair, Decedent became non-responsive. Decedent was then transported to the hospital, where he was pronounced dead at 11:44 a.m.
24. An autopsy was performed by Dr. Christopher Gulledge, who determined that the cause of death was bilateral saddle pulmonary thromboembolus.
25. Dr. Forbes McMullin opined Decedent's death was causally related to Decedent's fall on February 18, 2008.
26. Decedent's injury of February 18, 2008 occurred while he was on his lunch break and during a time when he was not being paid by Defendant-Employer. Decedent was not playing basketball at the invitation of Defendant-Employer, and he was not required by Defendant-Employer to participate in the activity.
27. At the time of the incident in question, Decedent was not engaged in any task *Page 9 
related to his employment as a mill operator. Accordingly, there was no reasonable relationship between Decedent's injury and his employment with Defendant-Employer.
28. At the time of the incident in question, Decedent was not engaged in any task or activity that benefited Defendant-Employer directly or indirectly. Accordingly, at that time, the Decedent was not acting in furtherance of Defendant-Employer's business or for the purpose of accomplishing the duties of his employment with Defendant-Employer.
29. Based upon the totality of the credible evidence of record, the Full Commission finds that the injuries Decedent sustained on February 18, 2008 were not the result of an injury by accident arising out of or in the course of his employment with Defendant-Employer.
30. The evidence of record shows that Plaintiff earned a total of $25,552.26 during the 52 weeks preceding his injury.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. "In order for a claimant to recover workers' compensation benefits for death, he must prove that death resulted from an injury (1) by accident; (2) arising out of his employment; and (3) in the course of the employment. The claimant has the burden of proving each of these elements." Pickrell v. Motor Convoy,Inc., 322 N.C. 363, 366, 368 S.E.2d 582, 584 (1988) (citingHenry v. Leather Co.,231 N.C. 477, 479, 57 S.E.2d 760, 761 (1950)).
2. An injury arises out of the employment when there is some causal relationship between the employment and the injury for which the claimant is seeking workers' compensation benefits. Bare v.Wayne Poultry Co., 70 N.C. App. 88, 318 S.E.2d 534 (1984),cert. denied, *Page 10 312 N.C. 796, 325 S.E.2d 484 (1985). Although the employment need not be the sole cause of the injury, there must be a reasonable relationship between the injury and employment. McGrady v. OlstenCorp., 159 N.C. App. 643, 583 S.E.2d 371 (2003).
3. "To be within the scope of employment, an employee, at the time of the incident, must be acting in furtherance of the principal's business and for the purpose of accomplishing the duties of his employment." Troxler v. Charter Mandala Center,89 N.C. App. 268, 365 S.E.2d 665 (1988).
4. Based upon the totality of the credible evidence of record, the injuries Decedent sustained on February 18, 2008 were not the result of an injury by accident arising out of or in the course of his employment with Defendant-Employer. N.C. Gen. Stat. § 97-2(6); See,Troxler v. Charter Mandala Center,89 N.C. App. 268, 365 S.E.2d 665 (1988).
5. The Commission has considered the methods for calculating Plaintiff's appropriate average weekly wage in this case as set forth in N.C. Gen. Stat. § 97-2(5) and finds the first method to be appropriate based on the best evidence available. The evidence of record shows that Plaintiff was employed by Defendant-Employer for more than 52 weeks prior to his injury. Furthermore, there is no evidence in the record which shows that Plaintiff lost more than seven consecutive calendar days at one or more times during the 52 week period preceding his injury. Plaintiff earned a total of $25,552.26 during the 52 weeks preceding his injury. Based on the application of the first method set forth in N.C. Gen. Stat. § 97-2(5), Plaintiff's average weekly wage was $491.39, which yields a compensation rate of $327.61.
 ***********
Based upon the foregoing Stipulations, Findings of Fact and Conclusions of Law, the Full Commission enters the following: *Page 11 
 AWARD
1. Under the law, Plaintiff's claim must be, and is HEREBY DENIED.
2. No additional costs are assessed.
This the ___ day of June, 2011.
 S/___________________ LINDA CHEATHAM COMMISSIONER
CONCURRING:
 S/___________________ STACI T. MEYER COMMISSIONER
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER